Appellant. Ms. Harrison for the appellant, Mr. Lennon for the appellate. Good morning. Good morning, Your Honor. And may it please the Court. Lindsay Harrison representing the appellants. The first two issues in our brief, starting with the second to ensure we spent sufficient time there before turning to the first. The second issue is the Confrontation Clause issue. The District Court violated the defendant's right to confront the key witness against them at trial by admitting the Rule 15 deposition in evidence. The witness was the alleged co-conspirator, Mr. Yindir Rung. And he was unavailable to testify live at trial for one reason. The government deported him before the trial and took absolutely no steps to ensure that he would be able to return for the trial to testify live. The government concedes that it cannot show a Confrontation Clause violation here was harmless beyond a reasonable doubt. So the only question for the Court is, was there a violation? And the answer is yes. Because once the government had the deposition of this witness, the government did not act with reasonable diligence and care to ensure Mr. Yindir Rung's presence at the trial. And I think a logical question for the Court is, what should the government have done differently? What would be reasonably diligent in this situation? And I think there are two answers to that question. One is theoretical and one is more practical. The theoretical question to that answer is what this Court articulated in the Lynch case in the context of preliminary hearing testimony. And that answer is that the government should have done precisely the same thing it would have done had the District Court denied the motion for a deposition. And I think the answer to that is that the government did not do that. And a more practical answer is what should the government have done in practice? So to answer that, I think it's actually helpful for the Court to understand why the witness was deported before the trial. Can I just be clear? Your focus, though, is what the government should have done before he was deported. That's correct, Your Honor. And the government says it's appropriate and proper to look at what it did after. And you tend to reject that. That's right, Your Honor. I think that the answer actually... What's the best authority for that? Well, the best authority for that is probably the case we submitted to the Court most recently from the Fifth Circuit, the Foster case, where the Fifth Circuit looks at this question and says it's not before or after, it's both. And the government's duty to be reasonably diligent applies the entire time. And I think it's actually particularly important for the But you understand where I'm going with this. So I just need to be clear what your position is. If it's both and the government says, you know, we move mountains afterward, that's enough. Then where are you even in the Fifth Circuit? I think the... Well, two answers to that. First, I think the government was not reasonably diligent even after. You know, there's not even evidence in the record that Union of before this court that he did, but citing only the evidence that was cited in the district court for the proposition that you could presume because it was signed for by K-Y-E-N. But, of course, that's not the person's name and it's also not how he signed his plea agreement. So there's no way to know. And that's the problem with looking only to actions taken after the witness is deported. Because by then, he's outside of the government's control. He's outside of the government's custody. And it's really speculative as to whether or not the government's going to be able to get him to come back. That's why it's most critically important for the government to be diligent before the witness is gone. So you say material witness hold his passport? Is there a government's response? Well, the government said is but due process. Now, that brings me back to the first issue, which is the standard. What would the government have done here had the district court denied the motion for a deposition? In that situation, the government doesn't say, well, we have to protect his due process rights. The government holds the person as a material witness. We don't know that on this record. We don't know that that's what the government would have done here. But I think it's reasonable to believe that's what the government would have done here because that's what the government does in this sort of case. And in our reply brief, we cite examples where courts are saying to the government, you move all the time to hold individuals as material witnesses. And there's the Aguilar Ayala case from the Fifth Circuit where there was actually a standing order because the government had moved to hold all aliens as material witnesses in smuggling cases. So that does tend to be the practice. But even if- Is that not raised due process concerns for the witnesses themselves? I mean, here's somebody who's served his time. And if he wants to be free and elsewhere, I mean, how should we or how should the government weigh the due process rights of the witness against the due process rights of the accused in this case? So I think that what the appropriate thing to do is to have a hearing at which the witness can articulate the reasons why he believes he should be allowed to be free. And the government can articulate why the person is a material witness. And if the court then believes that there are due process concerns that counsel against holding him in detention as a material witness, then there are alternatives, including supervised release, providing him with a work permit, providing him with a housing stipend. Those are the sorts of things the government does with victim witness funds when it needs to have a witness present in the country to testify. And what's important here is that the government didn't even consider any of those alternatives. The government deported Yinder Rahm without even considering any of those alternatives because the government had the deposition testimony it wanted and needed, and that was the end of the story for the government. And what the Sixth Amendment says is that that is not sufficient, that Mr. Burden and Wingon had a confrontation clause right to confront the witness against them at the trial. So are you saying that maybe it would be a due process violation to restrict Mr. Yinder Rahm's freedom to go when he was done with his sentence and when he was deportable, but the government didn't even find out, for example, would he voluntarily remain in the United States if he had a stipend? And even under electronic monitoring, he might have been willing to stay. We just don't know. Given that we don't know whether that conflict exists on this record, we can't act as if it did. That's correct, Your Honor. And I think given that the government now says it was futile to try to bring him back, that it counsels in that sort of a situation even more in favor of these reasonable diligence and care before you make the decision to deport the witness, which in that situation virtually guarantees that the defendant's confrontation rights are going to be deprived at the trial. And in a situation where the government doesn't even dispute that the confrontation clause violation was prejudicial, again, that's an even more clear situation where there's a duty to exercise reasonable diligence and care. Let me ask you about, you're not accusing the government of bad faith, are you? Not at all, Your Honor. Because the one I'm not concerned with is the district judge who did everything, including sitting in on the deposition. And you're not saying she was lulled or anything by the government because I noticed that in your brief, you do not correct what she actually said that her later order corrected. That is, if Yindir Rahm is not deported by September of 2016, the government fully intends to have him testify. In other words, the government said all along, whether they're right or not, but we don't have any control over whether he's deported. And she was guided by that. And so set up the deposition, videotaped it, she was present. So a couple of points. First is, that's correct, we don't argue that the government acted in defiance of not the standard that this court requires. The Lynch case, I think, makes that very clear, albeit in the context of preliminary hearing testimony rather than deposition testimony. But we don't argue that there was any bad faith. I do think that the district court made a mistake because the reason the trial was moved back is that the government hadn't produced the translations of the documents intended to use in its case in chief. That still hadn't happened when the deposition took place of Mr. Yindir Rahm. And when the government moved for the deposition, the defendants opposed the deposition on the grounds that they weren't ready, exactly the same reason why they had needed a continuance. And at that time, the district court said, you're right, you cannot get a fair trial until you have these translated documents. But of course, they still didn't have them at the time of the deposition. And so the very prejudice that caused her to continue the trial was suffered because the critical witness was deposed without those same documents. The government actually doesn't say why they canceled Harmless Error in their brief, but I think that has to be one of the reasons why, is that this very important evidence, the spreadsheet we go through in our brief and so on, wasn't translated. And so the deposition went on for four days because it was trying to figure out, well, what are these documents and what do they mean? And had he been at trial, the defense would have had those documents, the cross-examination would have been much more focused. They could have adjusted the because the jury wasn't there and the deposition happened months later. Can I ask you if you have a position, if it's your position, this isn't this case, but the only time to recognize or allow a Rule 15 deposition would be if you expect that witness will not survive until the trial. I think that's the clearest situation, but I don't think it's the only one. I think where the government does exercise reasonable diligence and care, for example, securing a promise from the witness to return and the court hears that promise and believes it and issues a subpoena to the witness before the witness leaves, I think in that situation it may be reasonable to grant a Rule 15 deposition because the government's been reasonable and diligent and perhaps the witness is going to be going to a country that's dangerous or where it may be difficult to return. In that situation, I think it would still be appropriate to grant a Rule 15 deposition. Now, if I can turn to the first issue in the brief, which is the jury instructions. In our issue in that situation, just to focus the court, is that there was prejudice suffered because the jury instructions allowed the jury to convict based on violation of any known legal obligation, not just the particular legal obligation that is embodied in the AECA and in the ITAR regulations. And let me just go right to the heart of why there was prejudice here. Throughout the trial, again and again, the government pointed to one thing above all else that showed the defendants allegedly had a guilty mind. And that was the government argued he hid items in packages that were going to Thailand. But if you look at that evidence, what he was doing was trying to hide them from the Thai authorities in order to evade Thai customs laws. And the email that the government likes to cite again and again, and actually at length discussed during the closing, is Exhibit 211T, which is the he-he email, where they're almost joking about hiding these items in the packages. And if you look at the appendix at 587-89, that's the closing argument of the government. And they're talking about a scope, and the government reads almost the entire exchange into the record for the jury. And it says, you know, if you put stuff in the packages, that won't look good, it won't clear customs, it will cost 400 baht per kilogram to pay the people who can bring this stuff through customs. And then explains that Burden says, well, they would know just by looking at it, that they there are the Thai authorities. So the question for the court is, based on the instructions as read to the jury, could the jury have convicted based on a theory that he knew he was violating Thai law? And under the Haidt case, if there are doubts about whether the jury, based its verdict on the proper construction of guilty purpose or intent, a new trial is required. And the court can affirm only if it's highly improbable that the jury found the defendants guilty under an improper legal theory. I think given the focus throughout the trial on this evidence, that they were trying to evade Thai customs laws, the court cannot say that in this situation, the jury didn't convict based on an improper legal theory. And the instructions that the defendants had advocated for would have prevented that, because those would have required the jury to find that he needed a license in order to export these items. There the focus is on the statute and on the regulations. Why isn't, wouldn't the instruction have been cured if, and I'm looking at the jury instruction in the appendix on page 66, in describing willfulness, there's two paragraphs, the third to last and second to last on that page. And there's a willfulness description, and then those two paragraphs close with, the government must prove beyond a reasonable doubt by reference to facts and circumstances surrounding the case, that a defendant knew that the conduct was unlawful. What you would ask for is that a defendant knew that exporting the magazine and grenade launch mount was unlawful. Why wouldn't that alone, without reference to licensing, suffice? So I do think that would also have cured the particular prejudice from this case. And that's the instruction from the Murphy case. But of course, that wasn't what was used. And I think the court could articulate that as the standard, which is what was articulated in Murphy. And that would provide guidance in future cases, but it still would require reversal in this case. Now here though, if, I mean, I guess the reason that it seems to me, whether he knew and willfully intended to export without a license, the license part seems neither here nor there. Because if he doesn't even know there is, that it's possible to get a license, to do it lawfully, but he does know it's unlawful, full stop, and he does it anyway, without a license, isn't that enough to support the conviction? Well I think there's sort of the question of what is the what there? What is unlawful? That exporting these munitions that are on the list, and so if what he knows is these are munitions, and that US law prohibits the export of munitions, that that would be enough. And then only in a case with different facts, where perhaps this individual had been in Thailand and received munitions, and then he tries to defend against willfulness by saying, I received them before, I knew they could be mailed, so I just mailed them. And then the government would want to vitiate that defense, or that putative naivete by saying actually you knew that there was a license requirement, and that's why you received those in the past. So I guess the question is, if we put aside any necessity of willfulness vis-a-vis license requirement, and we grant that what the instruction should have said is the defendant knew that exporting the magazine and grenade launch mount was unlawful, if that's enough, then why can't we say that what's on page 66 altogether is enough, because it refers not to Thai law, but in detail to the Arms Control Act and ATAR? So I think the answer is that it's not actually full stop illegal to export the magazines and the mount to Thailand, it's only illegal to export them without a license. And that's the reason why the Fifth Circuit pattern instructions refer to the licensing requirement, because it's actually, it's not a crime full stop to export these items, you just have to have a license. But he didn't in fact have a license, he doesn't claim he had a license, he doesn't claim that he believed what he did was lawful because he'd seen it happen before, and unbeknownst to him there was a license. So to me, the real risk, as you point out, is that he was convicted because he showed that he knew that he was doing something wrong, but that the jury found that he was guilty based on his apparent consciousness of wrongdoing vis-a-vis Thai import law, customs law. Yes, that is correct. And the reason why the instruction as a whole doesn't cure that is because the jury, reading this instruction, would have been able to convict based on knowledge that the conduct violated any known legal obligation. It's in disregard of a known legal obligation. And that's why all of the evidence about Thai law and the intent evidence and the discussion at length during the closing argument would have led the jury to say, look, there's clearly a dispute about whether he knew there was a license required under U.S. law. But there's not a dispute about whether he knew this violated Thai law. That came in really through defense counsel during the deposition because the instructions hadn't been decided yet, and at that time the defense thought that was going to be exculpatory. But there also wasn't, I mean, there was ample evidence that he knew that there was a ban on putting the license requirement aside for the reasons that I said. He knew there was a ban on exploitation of munitions. He had the shelf. He was saying don't do that. And his defense was that he thought that exporting these things for use in BB guns was okay. So that all, the jury, that was very much before the jury. And given that this page and this jury instructions talks nothing about Thai customs law, the question is whether in the aggregate that instruction suffices. Right. And the question, the standard is, is there grave doubt that the jury might have interpreted? And I think the reason there's doubt is the focus throughout the trial, at opening argument, during, at length, during the cross-examination of Mr. Yanderam, during the testimony of the agents, of Agent Stein, he talks about this as well, and about violating Thai law and hiding the items from Thai customs authorities. And then at the closing argument, three pages of transcript going through this email, and it's very memorable, the email, because of the he-he language, right? And that, what that's about is hiding these items from the Thai authorities. So if you have a dispute, if you're a juror, and you have a dispute about whether he knew these things may or may be, were violating US law, he thought they were BB guns, the government says no, he knew they were illegal, but you know there's not a dispute that he was trying to violate Thai law. And you look at the jury instructions and they say, in disregard of a known legal obligation, as a juror, it makes your job really easy, because you can go to the thing that's not contested, and convict based on that, and not have to deal with the difficult question of, well did he really know that the magazines and the mount, which are the only items in the indictment, required a license to be exported. And that's why here, the court really can't say that it has no doubts that the jury did the easy thing, when, when otherwise it would have had to do the hard thing. And if I can reserve the imbalance of my time, I suppose. Well, we'll give you a couple minutes, but I'm rusty on the facts, and I think Judge Pillard alluded to it, but wasn't there a box that said do not send a... There was a shelf, that's right, Your Honor, they referred to it as a no-go shelf. And the jury knew that? Yes. The jury knew that when the defendants thought an item was for a real gun, or for example, was military apparel, because after they received the seizure notice about the military helmet, Mr. Burden told his employees, don't ship military apparel, we're not allowed to, put it on the no-go shelf. So the jury knew that the defendant at least understood that yes, some items couldn't go to Thailand from the U.S. because they violated U.S. law. But the problem is, the items that did go, he didn't know. Right, that's the problem, is you have an unsophisticated man who doesn't even speak English fluently trying to figure out these extraordinarily complicated ITAR regulations that there are entire departments of D.C. law firms devoted to helping sophisticated defense contractors figure out, and so his defense to the jury is, I did not understand that these items were munitions that required a license to export. But the jury can convict him if they think he knew that he was trying to violate Thai law. That makes the jury's job easy. Okay, we'll give you a couple minutes. Thank you, I appreciate it. All right. Mr. Lennon. Thank you, Your Honor. Good morning, and may it please the Court. Dan Lenners for the United States Department. Her argument puts the cart before the horse. In focusing on potential prejudice, she ignores the fact that this Court must first determine the correct construction of Congress's use of the term willfully in the Arms Export Control Act. The statutory history, the plain statutory language, every court of appeal to have addressed this issue all make clear that the proper construction is the Bryan standard as articulated by the Supreme Court, which is that the defendant know that his conduct is unlawful. That answers the prejudice question. The dissent in Bryan is what complained and first raised this idea that that's... Don't we have Hernandez in the Fifth Circuit that goes, that requires a much more specific willfulness instruction? There are cases from the Seventh Circuit, Eleventh Circuit, and Fifth Circuit that appear to apply the Cheek and Ratzlaff standard. I thought you just said that the circuits were uniform and not the Bryan. If I said that, that was a misstatement. I'm sorry. The overwhelming circuit authority, the Second, Sixth, Third, Fourth, First, have all adopted the Bryan standard, and correctly given Congress's purpose and the plain statutory language. The dissent in Bryan, Justice Scalia raised this complaint that that standard would improperly allow a defendant to be convicted for knowingly violating some different law. In that case, New York City law about selling without a license on a sidewalk. The majority rejected that contention. It said it is enough to convict a defendant for acting badly, for having a bad mens rea, this intermediate standard that the defendant knows that what he's doing is unlawful. But aren't those, Mr. Leonard, really in a way two separate questions? The willfulness instruction is adequate under, if one takes the majority view from Bryan. But where you have a case with facts that show various different potential unlawfulnesses, whether it's a munitions law or any other law, there's a separate obligation that the court has to make clear when it talks about willfulness, which law violation is being referred to. I have two answers to that, Your Honor. The first is the defendants never raised that complaint below. They never said that even accepting the court's ruling that Bryan willfulness standard applies, given the facts of this case, we need to further clarify this instruction. I'm sorry to cut you off. They do in the sense that the defect that they've consistently pointed to is the risk of conviction on something that wasn't charged. And so it seems like it's sort of a less intrusive way of potentially that we could respond to that objection and say, well, you don't need to go all the way to requiring that they know that it's the Crimes Control Act, and they know that it's the ITAR, and they know there's a licensing requirement. But in order to respond to the objection that they squarely made, the instruction does at least need to rule out the risk that he was convicted based on putative awareness of wrongdoing that had no nexus with the charged action. I disagree that they preserve that objection below. That objection would have come about because of the facts introduced at trial, and it's something that they would have need to make at the end of trial, saying on the specific facts, as I understand Your Honor's question, on these particular facts, this jury instruction needs to be tweaked. And they never made that later objection. They made the earlier objection that the court should apply the cheap rat's laugh standard, but never that on the facts of this case, a different jury instruction is necessary to be clearer. I also, there's no prejudice from the court's jury instruction. Defense counsel's characterization of the trial as focusing on Thai customs law is just not accurately reflect what happened below. The focus was on the defendant's knowledge of the licensing requirement. There were several customs notices that the defendant received that the government introduced into evidence, and it was on those notices that the government was focused. His actual knowledge that he required, he needed a State Department license to export firearms and pieces of firearms, and the discussions that Burden and Yindyaram had, acknowledging that what they were doing was illegal. That was both the focus of the evidence. It was also the focus of the government's closing argument, in particular, the December 2010 seizure notice that Yindyaram sent to Burden that specifically referenced the Arms Export Control Act and the munitions list. And Burden, or Yindyaram, excuse me, said, once I received this notice, I knew it was firearms parts from the United States. When I sent it to Burden, he knew, too. And so the focus of the government's argument in closing and of the entire trial was on illegality under United States law. In fact, defense counsel, as we point out in our brief, said that the reason that Burden is innocent is because he was worried about Thai customs law. That was the defense's argument. And so the defense, it's a mischaracterization to say that somehow the jury misunderstood and convicted Burden because they were unsure whether he knew he needed a license, but were convinced that he was intentionally evading Thai customs law and therefore had violated the Arms Export Control Act. In terms of the confrontation clause issue, the government's view is that it would have been unreasonable under the facts of this case for the government to take affirmative steps to attempt to prevent Yindyaram's voluntary removal to Thailand. Two years before the trial in this case, at which point the government had no reason to believe that Yindyaram would testify at trial and had no reason to believe that he would be removed before a trial occurred, the government entered a plea agreement with Yindyaram in which he agreed to immediate voluntary removal upon completion of his sentence. That plea agreement bound the government to not take affirmative steps to prevent that immediate removal, particularly in a situation such as this, when that was a benefit to Yindyaram. He wanted to go home. In the agreement, he avoided deportation proceedings. He had immediate removal through entry of the judge's order. This was the way for him to get home as fast as possible. Mr. Lennartz, at least based on what we have in the record, that seems not squarely supported. In terms of the agreement, it says your client agrees to the entry of a stipulated judicial order of removal, that he's removable from the United States upon the completion of the sentence imposed in this case. Your client consents to the entry of an order of removal issued by this court and to the immediate execution of such order upon completion of the sentence, but it doesn't obligate the United States to act on any particular timeline. It's really about the defendant, Yindyaram's agreement that he could be immediately removed. I think I would need you to point me to something more to say that the government actually was bound to act swiftly with respect to this removal. I agree that the plea agreement doesn't affirmatively place obligations on the government. However, it was a benefit to Yindyaram to be able to be removed as quickly as possible, and this court routinely, liberally construes plea agreements against the government as the drafter of those agreements in favor of defendants, and finds that even when the expressed language doesn't clearly bind the government, that the clear purpose of the agreement is violated by something the government did. And so here, the purpose of this was both to allow the government to remove him as quickly as possible, but it also gave Yindyaram the benefit. Do we know that had he been asked before he was removed to stay with some kind of support from the government, or even without any support from the government, if he were invited to stay, would he have resisted that? The district court found that he would have. The district court found that those efforts would have been futile, given Yindyaram's refusal to speak with the government and his refusal to return for trial. So she found in her order granting the admission of his deposition at trial that Yindyaram would not have agreed to stay had the government asked. Based on post hoc, when he was already in Thailand and was not returning? Based on his refusal not even to speak to government prosecutors, and based on his refusal to come home, or to come back to the United States to testify, she found as a factual matter that further efforts by the government to get him to voluntarily stay would have been futile. If I may clarify a few things factually, Yindyaram did receive the government's subpoena. Even if there's some dispute about whether this FedEx envelope was actually received by him, he told the Department of Homeland Security agents that he had received the prosecutor's email, and the prosecutors attached the subpoena to that email. So Yindyaram, at the very least, knew that prosecutors had emailed him a subpoena and refused to speak with prosecutors or to return for trial when he spoke to Department of Homeland Security agents. So, but here's a question about his reluctance. I mean, if you go back to the point before he's been, before Yindyaram has been deported, and if the district court is right that at that time he was resistant and would have only testified with subpoena and, you know, then doesn't that further underscore the government's obligation at that time not to let him slip away? Because if it was hard, if he was reluctant when he was in the United States, the notion that he would be able to be brought from Thailand is really hard to credit. So it's the government's view that it would have been unreasonable to hold him in the United States, whether in custody or out of custody, that on the facts of this case, given the government's plea agreement and the benefit to Yindyaram of immediate removal and immediate return home, that it would have been unreasonable on the facts of this case for the government to take affirmative steps such as seeking to hold him as a material witness, seeking to make him stay in the country by withholding his passport. The district court affirmatively found that it would not have been in the interest of justice to incarcerate Yindyaram as a material witness pending trial. But the government would have, I know we've been over this before, but just to clarify, the government would have had him testify in person had the deposition been denied. That's what the district court said. That's not what the government said. What the government said in its motion to grant a Rule 15 deposition was that the government intends to work to ensure that the witness is available for trial. In what way? The government didn't say. But I'm asking you, I guess I'm asking you, if the government intended to do that, were the deposition denied, given the admitted prejudice of being limited to the deposition at trial, wouldn't the same efforts have been in order to protect the confrontation rights of the defendants? It's my view that the government took the same efforts here as it would have had the deposition been denied. The government was precluded by the plea agreement from keeping Yindyaram in the country any longer, and thus he would have been removed regardless. And I don't think the defendants disagree that the government undertook reasonable good faith efforts after Yindyaram's removal to secure his testimony, both by contacting his defense counsel, emailing him, sending a FedEx envelope that was signed for at his last known address, and in fact actually contacting him and speaking with him. And that's what distinguishes this case from the many cases relied upon by the defendants, is that the government actually was able to find the witness in the foreign country in this case, speak with that witness, and that witness adamantly refused to return or even to speak with prosecutors. And that's why the government believes that it satisfied the Sixth Amendment's unavailability test in this case. So if the district court had not granted the Rule 15 deposition, and everything had gone as was predictable, the government would have had to drop the case? No, Your Honor. The government can try this case and intended to try this case without Yindyaram's testimony. When Yindyaram entered a plea agreement, he was not a cooperating witness, and so the government anticipated going to trial without his testimony. It was only after the trial was continued and that Yindyaram agreed to be deposed that the government's trial strategy changed and they understood that they could in fact put his testimony on a trial. All right. Thank you. Thank you. Why don't you take two minutes? Let me start with the plea agreement. We do not read the plea agreement the way the government reads it, and it is our view that the plea agreement does not preclude the government from doing anything at all, much less holding him just from April until September, which was just really a matter of months until the trial took place. And if the government had thought that they needed to do something to keep him in the country, that there was an easy thing for the government to do, which is produce the translations of its documents faster, and then the trial can happen earlier, but that's not what happened here. Instead, the government didn't even produce those translations in time for the deposition. Second, we disagree that the government would have taken the same efforts. I think the government would have sought a stay of removal or would have sought to hold him in the United States under 8 CFR 215.3 G. But what if it would have? I mean, there's a real serious issue here about the due process rights of individuals. I mean, holding people to act as material witnesses is no small thing. And the notion that, given what the trial dockets are, that this could go on for much longer than, in fact, the delay was, is troubling. And your position on that is? Is that, number one, that I agree that it's important to consider the due process interests of a material witness, but that the government doesn't and wouldn't take that position when the government needs the testimony. Well, they just said they would. Well, they did say that today, but if you look at other cases in which the government presents testimony and is deprived of the right to take the deposition, in those situations the government does hold the witness as a material witness or supervise release or some or other form of releasing them in the community, but leaving them in the United States, like holding their passport. And the last point I want to make is that the government doesn't contest under Rule 30D that we preserve our objections to the instructions. The first time I've heard that here today, and I think that's not correct. If you look at the motion to dismiss from August of 2015, the defendants argued that the government couldn't prove a willful violation of U.S. law because the goal was to violate Thai law, and brought those issues into the case well before, and then continued to preserve them again and again, and wasn't obligated, once the trial court has said, this is what I'm doing for instructions and I'm not changing my mind, to re-raise those objections again and again. I think their view is that you made the objection, but that the remedy that you proposed was different from the remedy that I was pointing to. Yes, that's right, but the remedy we proposed would have cured the problem, and that's all that's necessary. Thank you. All right, Ms. Harrison, the court did not appoint you, but you put your name on the pro bono list, and we depend on that list, so thank you. Thank you very much, Your Honor.
judges: Henderson, Rogers, Pillard